THE 'IN' PORTERS, S.A., Plaintiff,

v.

HANES PRINTABLES, INC., and Sarah Lee Corporation, Defendants.

No. C-86-956-WS.

United States District Court,
M.D. North Carolina,
Winston-Salem Division.

June 11, 1987.

Randolph M. James, Winston-Salem, N.C., for plaintiff.

J. David Mayberry, George L. Little, F. Joseph Treacy, Jr., and Rodrick J. Enns, Winston-Salem, N.C., for defendants.

## MEMORANDUM OPINION

GORDON, Senior District Judge:

Plaintiff brings antitrust, unfair trade, contract, and interference with contract claims. Defendant moves to dismiss. · The court dismisses the antitrust claim for a lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and the unfair trade claims for a failure to state a claim under Fed.R.Civ.P. 12(b)(6). The court retains the contract and interference with contract claims.

## FACTS [1]

Defendant Sarah Lee, a Maryland corporation with its principal place of business in Illinois, owns all of the stock of defendant Hanes Printables. Defendant Hanes Printables ("Hanes"), a Delaware corporation with its principal place of business in North Carolina, manufactures and exports fashion outerwear through its foreign subsidiary, Hanes International, to distributors in Europe. Hanes International, a Belgian corporation, is not a named party in this case. Plaintiff 'In' Porters, a French corporation, distributes imported Hanes outerwear to retailers in France.

Plaintiff began buying goods directly from Hanes in early 1982. A year later, Robert and Claudine Goldstein, officers of plaintiff, met in London with Ephraim Kogen, Hanes' sales agent, and Keith Alm, at that time President of Hanes, to discuss Hanes' European marketing strategy. Robert Goldstein recommended that Hanes market its product as outerwear ·and develop a sweatshirt and sweatpants program. In turn, Hanes implemented a European marketing program reflecting Goldstein's recommendations. The program contemplated using distributorships throughout Europe to market and resell the outerwear.

During 1983, Hanes expanded its European network of distributorships and, in November 1984, held its first distributors' meeting in Merelbeke-Belgian, the location of Hanes' foreign subsidiary, Hanes International. In a handbook provided at the meeting, Hanes described Hanes International as "our international distribution center," designed to receive Hanes outerwear from the United States and transport the outerwear to individual distributors throughout Europe. Jos Linkens, an offi-

---

**1.** The court, in assessing defendants' motion to dismiss, assumes as true the allegations in plaintiff's complaint. In presenting the plaintiff's version of the facts, the court expresses no opin- ion on the credibility of the facts and notes that defendants contest plaintiff's version of the facts.

cer of Hanes International, attended the meeting. Plaintiff, as a Hanes distributor for areas in France, also attended the meeting.

In April or May 1985, Hanes offered plaintiff an exclusive distribution right to Hanes products in a specified territory called L'Ile France. As a term of the exclusive distributorship, Hanes required plaintiff to cease the distribution of competing products and to refrain from initiating the distribution of competing products during the tenure of the exclusive distributorship. At the time the offer was made, plaintiff carried a complete line of American outerwear from approximately one dozen manufacturers. Following extensive negotiations between the parties, the bulk of which occurred in North Carolina, plaintiff accepted the exclusive distributorship and terminated its relationship with the other American manufacturers.

The parties created the exclusive distributorship contract through oral expressions, course of performance, course of dealing, course of trade and numerous writings, including correspondence and internal memos. The parties did not reduce the contract to a formal written document. The parties agreed the contract would last for a reasonable period, though not less than three years and with the original term renewable for three year periods. Hanes agreed to notify plaintiff in the event that plaintiff performed unsatisfactorily, thus giving plaintiff an opportunity to improve its performance and thereby avoid termination.

Plaintiff performed all of its obligations in accordance with the contract terms. Hanes never expressed dissatisfaction with plaintiff's performance and, on two occasions, Hanes awarded a plaque to plaintiff in recognition of plaintiff's exemplary performance.

During 1986, Hanes' Belgian distributor, an outfit called "Actionwear", whose principal shareholder is Etienne Vandermoortele, began invading plaintiff's territory with Hanes products and Italian products manufactured to the same specifications and design as Hanes products. Plaintiff states in its complaint that "Actionwear is and has been organized for the purpose of taking over the territory of distribution developed by plaintiff with the full knowledge, consent and cooperation of Jos Linkens, Keith Alm, and others unknown to plaintiff at this time." Plaintiff believes that Tri-Star Investments, a Dutch corporation whose investors include Vandermoortele, Linkens, and Alm, is also involved in the attempt to invade plaintiff's territory. In late May or early June of 1986, Defendant Hanes notified plaintiff that the exclusive distributorship would terminate on 30 June 1987.

Plaintiff filed this action on 12 December 1986 asserting four claims: (1) violations of the Sherman and Clayton Antitrust Acts in conspiring to restrict plaintiff's distribution territory, fixing the prices for which plaintiff could sell Hanes products, and tying the purchase of certain Hanes' products to the purchase of other Hanes products; (2) violation of North Carolina's unfair and deceptive trade statute based on the same facts that allegedly violate the federal antitrust laws; (3) breach of the exclusive distributorship contract; and (4) intentional interference with the distributorship contract by conspiring to undermine plaintiff's distributorship.

Defendants' filed this motion to dismiss on 2 February 1987 contending that the federal antitrust and state unfair trade claims fail to establish the requisite substantial effect on the commerce of either the United States or North Carolina. These claims, defendants argue, arise solely from alleged conduct and injuries occurring in France, thereby falling outside the limited extraterritorial reach of the federal antitrust and state unfair trade laws. As to the breach of contract claim, defendants maintain that they are not parties to the alleged contract. Defendants insist that the contract, if formed and binding in the first instance, is between plaintiff and Hanes International. Next, defendants assert that the interference with contract claim should be dismissed because, among other things, plaintiff did not allege facts that would satisfy the breach-of-contract

element of such a claim. Finally, defendants contend that plaintiff's entire complaint should be dismissed based on the doctrine of forum non conveniens.

## DISCUSSION

### 1) Subject Matter Jurisdiction: Extraterritorial Reach of the Sherman Act [2]

The Sherman Act by its terms applies to "every contract, combination ... or conspiracy," and every person who shall "monopolize, ... attempt to monopolize, or combine or conspire ... to monopolize" trade or commerce "among the several States, or with foreign nations." 15 U.S. C.A. § 1 (Supp.1987). The Supreme Court construed this language narrowly at first. In *American Banana Co. v. United Fruit Co.*, Justice Holmes stated that the laws of the locality where the injury occurred dictate the rights of the parties:

> the acts causing the damages were done, so far as appears, outside the jurisdiction of the United States.... It is surprising to hear it argued that they were governed by the act of Congress ... [t]he general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done.

213 U.S. 347, 355–56, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909). The Second Circuit, hearing a case on certification from the Supreme Court, largely rejected Holmes' "locality" test in *United States v. Aluminum Co. of America (Alcoa)*, expanding the Sherman Act's extraterritorial reach to foreign conduct having a domestic effect. Judge Learned Hand wrote that "any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state repre-

hends; and these liabilities other states will ordinarily recognize." 148 F.2d 416 (2d Cir.1945). The "effects" test announced in *Alcoa* has been widely followed by courts. ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS 529 (2d ed. 1984).

Since *Aloca*, courts have attempted to define the magnitude and type of domestic effects necessary to invoke jurisdiction under antitrust laws. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1161, 1187 (E.D.Penn.1980) (thorough discussion of the evolution of the law in this area). The Department of Justice stated that the Sherman Act applies to foreign transactions that have a "substantial and foreseeable effect on U.S. commerce." *Antitrust Guide for International Operations* 6–7 (Jan. 26, 1977); ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS 528–29. In contrast, one court held the effect need not be substantial and direct as long as it is not *de minimus*. *Dominicus America Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680, 687 (S.D.N.Y.1979). Other formulations of the "effects" test included:

> 'directly and materially affect[s] foreign commerce'; 'the combination affected the foreign commerce of this country'; '[the conspiracy] intended to affect imports and exports'; 'though there is no showing as to the extent of commerce restrained it [the contract] deleteriously affected [United States] commerce'; '[the conspiracy had] the effect of suppressing imports into and exports from the United States'; ... 'a direct and influencing effect on trade between the United States and foreign countries....'

*Zenith*, 494 F.Supp. at 1187.[3]

In 1982, Congress ended the debate over the proper formulation of the effects test

---

**2.** While plaintiff brings antitrust claims under both the Sherman and Clayton Acts, the court determines whether these claims fall within the extraterritorial reach of antitrust laws by reference to only the Sherman Act, as this is the typical manner in which "extraterritorial reach" is analyzed. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1161, 1164 (1980) ("issues with respect to the extraterritori-

al application of American economic regulation are the same regardless of the particular statute being applied"). *See also Chatham Condominium Ass'ns v. Century Village, Inc.*, 597 F.2d 1002, 1010 (5th Cir.1979) ("jurisdictional scope of the Clayton Act is much narrower than that of the Sherman Act").

**3.** Other decisions have sought to modify the effects test by requiring analysis of internation-

by enacting the Export Trading Company Act ("Export Act"). Pub. L. No. 97–290, 96 Stat. 1233 (Oct. 8, 1982). Consistent with the view of the Department of Justice, the Export Act requires a "direct, substantial, and reasonably foreseeable effect" on the United States commerce before jurisdiction is proper. 15 U.S.C.A. § 6a (Supp.1987). *See Liamuiga Tours v. Travel Impressions, Ltd.,* 617 F.Supp. 920, 924 (D.C.N.Y. 1985)(Export Act adopts the "stricter effects test"). *But see Papst Motoren GMbH & Co. v. Kanematsu-Goshu (U.S.A.) Inc.,* 629 F.Supp. 864, 868–69 (S.D. N.Y.)(cites new act yet continues to require only that the effect on United States commerce not be *de minimus*). The Export Act specifically provides as follows:

Sections 1 to 7 of this title [i.e., the Sherman Act] [4] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, or a person engaged in such trade or commerce in the United States; and (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C.A. § 6a.

Congress enacted the Export Act in response to complaints from American firms that the antitrust laws impaired their ability to increase exports through aggressive competition or cooperation. *Liamuiga Tours,* 617 F.Supp. at 923; *Eurim-Pharm GmbH v. Pfizer Inc.,* 593 F.Supp. 1102, 1105 (1984); Areeda and Hovenkamp, ANTITRUST LAW 166 (1986 Supp.). "Congress sought to place American-owned companies operating entirely abroad or in United States export trade on equal footing with their foreign-owned competitors by freeing them from the possibility of dual and conflicting antitrust regulation." *Pfizer,* 593 F.Supp. at 1105. "[N]o longer is there any possibility that, because of uncertainty growing out of American ownership, such firms will be subject to a different and perhaps stricter regimen of antitrust than their competitors of foreign ownership." H.R.Rep. No. 97–686, 97th Cong.,

al comity and other considerations. *See, e.g., National Bank of Canada v. Interbank Card Association,* 666 F.2d 6 (2d Cir.1982); *Montreal Trading Ltd., v. Amax Inc.,* 661 F.2d 864, 869 (1981); *Uranium Antitrust Litigation,* 617 F.2d 1248 (7th Cir.1980); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir.1979); *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597 (9th Cir.1976). *See* Areeda and Hovenkamp, ANTITRUST LAW 171–76 (1986 Supp.); ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS (2d ed. 1984). The Ninth Circuit in *Timberlane,* the most noted of these decisions, devised a three-part test for determining subject matter jurisdiction under the Sherman Act. "The first part of this test requires 'that there be *some* effect—actual or intended—on American foreign commerce....' The second part asks whether the alleged restraint is 'of such a type and magnitude so as to be cognizable as a violation of the Sherman Act?' The third part inquires: 'As a matter of international comity and fairness, should this extraterritorial jurisdiction of the United States be asserted to cover [the alleged restraint].'" ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS 529–30 (2d ed. 1984). The court listed factors to be weighed in making the final, comity inquiry. *Timberlane* 549 F.2d at 614.

**4.** While the Export Act amends only the Sherman and Federal Trade Commission Acts and not the Clayton Act, the court applies the Act's "extraterritorial reach" guidelines to plaintiff's Clayton Act claim. *See* Areeda and Hovenkamp, ANTITRUST LAW 169 (1986 Supp.) ("Given the evident purpose of the new statute ... a court would find it difficult to take jurisdiction under Clayton Act § 7 over a venture that the new statute immunizes from the Sherman Act"); *Zenith,* 494 F.Supp. at 1178 (analyzed extraterritorial reach of Clayton Act under cases interpreting the Sherman Act). *See also Chatham Condominium Ass'ns v. Century Village Inc.,* 597 F.2d 1002, 1010 (5th Cir.1979) ("jurisdictional scope of the Clayton Act is much narrower than that of the Sherman Act").

2d Sess. 10, *reprinted in* 1982 U.S.Code Cong. & Ad.News at pp. 2431, 2495. As one commentary frankly stated, the Export Act "makes clear that the concern of the antitrust laws is protection of American consumers and American exporters, not foreign consumers or producers." Areeda and Hovenkamp, ANTITRUST LAW 166 (1986 Supp.)

Plaintiff in the instant case complains of injuries occurring in France. Plaintiff admits that it does not sell its products to consumers or retailers in the United States. Plaintiff maintains, however, that the conspiratory conduct of defendants ultimately injured United States exporters, since plaintiff terminated its relationship with a number of United States clothing exporters when plaintiff accepted the exclusive distributorship. Thus, plaintiff contends that the defendants' alleged wrongdoing has had an effect on the United States export trade, thereby enabling plaintiff to satisfy the jurisdictional requirements of the Sherman Act. The court disagrees.

The Export Act establishes three requirements that an antitrust plaintiff, other than a domestic importer, must prove to establish subject matter jurisdiction [5]: (1) the

5. An issue arises whether defendants' motion to dismiss the antitrust claim is an attack on the court's subject matter jurisdiction under Rule 12(b)(1) motion or an attack on the merits of the claim under Rule 12(b)(6). The law in some instances accords a differing degree of procedural protection to a plaintiff depending upon whether a court proceeds under 12(b)(1) or 12(b)(6):

The basic difference among the various 12(b) motions is ... that 12(b)(6) alone necessitates a ruling on the merits of the claim, the others deal with procedural defects. Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. The decision disposing [of] the case then is purely on the legal sufficiency of plaintiff's complaint: even were plaintiff to prove all its allegations, he or she would be unable to prevail. In the interests of judicial economy it is not improper to dispose of the claim at that stage. If the court considers matters outside the pleadings before it in a 12(b)(6) motion, the above procedure will automatically be converted into a Rule 56 summary judgment procedure. Here there are further safeguards for the plaintiff: in addition to having all of plaintiff's allegations taken as true, with all their favorable inferences, the trial court cannot grant summary judgment unless there is no genuine issue of material fact.

The procedure under motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleading. The facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could

under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Chatham Condominium Ass'ns v. Century Village, Inc.,* 597 F.2d 1002, 1011–1012 (5th Cir. 1979) quoting *Mortensen v. First Federal Savings & Loan Association,* 549 F.2d 884, 891 (3d Cir. 1977). *See Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982).

The court should apply 12(b)(6) if the resolution of a motion requires a determination of the merits or if "the jurisdiction facts are intertwined with the facts central to the merits of the dispute." *Adams,* 697 F.2d at 1219. A difficult question arises whether the court in applying the "effects test" under the Sherman Act, as amended by the Export Act, is in fact reviewing the merits of an antitrust claim.

Arguably, the effects test is a substantive element of an antitrust claim. Schematically, the Sherman Act parallels most statutes: a set of facts constitutes a claim *provided* that some other requirement is met. Thus, a party can state a claim under rule 10(b)(5) of the securities laws by satisfying the basic elements of a 10(b)(5) action, *provided* that the party bringing the action is purchaser or seller of stock. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Under this view, a statutory proviso always represents a substantive limitation on the scope of meritorious claims, and a failure to allege facts sufficient to satisfy a statutory proviso equals a 12(b)(6) failure to state a claim. From this perspective, a failure to allege facts that, if proven, would satisfy the effects test should be treat-

defendant's conduct must have a direct, substantial, and reasonably foreseeable effect on (2) *plaintiff's* continuing ability to export products (3) *from the United States.* A foreign company that demonstrates the requisite effect on the United States export trade, but fails to establish that it is within the class of injured United States exporters, lacks a jurisdictional basis to sue under the Sherman Act. *Pfizer,* 593 F.Supp. at 1106 n. 5. In other words, a foreign company can not demonstrate the domestic injury requirement by "piggybacking" onto the injury of a United States exporter.

Plaintiff in the instant case, not being within the class of United States export manufacturers allegedly injured by defendants' conduct, seeks to piggyback onto to the alleged injury of United States exporters. The Export Act, however, requires an actual injury to plaintiff within the United States—a requirement plaintiff clearly has not satisfied. Accordingly, the court con-

ed as a failure to state a claim, not a lack of subject ma'tter jurisdiction.

While the former approach treats all statutory provisos as substantive elements of a claim, another approach looks at each proviso and ask whether the proviso sounds in procedure or substance. If the proviso presents a threshold obstacle lacking any resemblance to the core allegations of wrongdoing in the case, then the court properly can distinguish the procedural proviso from the substance of the case and proceed under 12(b)(1). The Export Act, as a proviso to the Sherman Act, requires a qualifying effect (i.e., on United States export trade) on a qualifying party (i.e., an exporter from the United States). Inquiry into whether a complaint satisfies such qualifications, at least in the instant case, is divorced from an inquiry into the allegations of wrongdoing. When the court asks whether the defendants' conduct had the requisite effect on United States export trade and whether plaintiff is a member of the class of United States exporters, the court is not looking at plaintiff's substantive allegations of illegal acts under the Sherman Act; the court rather is making a threshold jurisdictional determination. Under this view, the court would treat defendants' motion under 12(b)(1).

Prior to the enactment of the Export Act, most cases treated a contention that a party failed the effects test as an attack on the courts subject matter jurisdiction. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1161, 1171–1178, 1171 n. 21 (E.D.Penn.1980). Moreover, all of the cases dismissing antitrust claims pursuant to the Export Act have treated the effects test as going to subject matter jurisdiction. *See e.g. Papst Motoren GMbH & Co. v. Kanematsu-Goshu (U.S.A.) Inc.,* 629 F.Supp. 864, 868 (S.D.N.Y.1986); *Liamuiga Tours v. Travel Impressions, Ltd.,* 617 F.Supp. 920, 925; *Eurim-Pharm v. Pfizer,* 593 F.Supp. 1102, 1107 (S.D.N.Y.1984). On the other hand, in a case prior to the Export Act, the Fourth Circuit applied 12(b)(6) to a contention that an antitrust complaint failed to allege a sufficient effect upon interstate commerce:

Whether the complaint was dismissed for lack of subject matter jurisdiction or failure to state a claim upon which relief could be granted is not clear. Since Congress specifically has conferred jurisdiction of Sherman Act claims (15 U.S.C. 15 & 26), we think it the better analysis to treat an insufficient plea of effect upon interstate commerce as a failure to state a claim upon which relief can be granted rather than lack of jurisdiction (in the sense of power) over the subject matter.

*Hospital Bldg. Co. v. Trustees of Rex Hospital,* 511 F.2d 678, 681 (4th Cir.1975) *reversed on other grounds* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In *Trustees of Rex Hospital,* the Supreme Court appeared to agree with the Fourth Circuit that 12(b)(6) applied, but did not discuss the issue and stated that its analysis of the case would be "no different ... under 12(b)(1)." 425 U.S. at 742 n. 1, 96 S.C. at 1851 n. 1. *See also McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (discussed interstate commerce element of Sherman Act in jurisdictional terms, but used 12(b)(6) terms in concluding that dismissal was improper). These cases addressed the interstate commerce requirement of an antitrust claim and not the requirement that foreign conduct have a certain effect on United States commerce.

The better rule appears to be to treat such motions under 12(b)(1), unless the facts central to the merits—i.e., the alleged wrongdoing forming the basis for asserting liability—are intertwined with the jurisdictional facts. *See Timberlane Lumber Co. v. Bank of America,* 749 F.2d 1378 (9th Cir.1984). In the instant case, the complaint is facially lacking in allegations sufficient to state a federal question under the Sherman Act. As previously discussed, a facial attack under 12(b)(1), in contrast to a factual attack, requires the court to assume as true the allegations contained within plaintiff's complaint. As such, while the court technically dismisses the case under 12(b)(1), plaintiff has received procedural safeguards commensurate with a 12(b)(6) motion. The court stresses, however, that if the court had been asked to make factual findings relevant to jurisdictional allegations (i.e., a factual attack), plaintiff would have more procedural protection under 12(b)(6) than under 12(b)(1). It is thus significant whether a court perceives itself as reviewing the merits of the case (i.e., 12(b)(6)) or a making a threshold jurisdiction determination (i.e., 12(b)(1)).

cludes that plaintiff fails to meet the jurisdictional requirements for gaining review of its antitrust claims.

### 2) Extraterritorial Reach of North Carolina's Unfair Trade Practices Act (N.C.Gen.Stat. § 75–1.1) [6]

■ The North Carolina Unfair Trade Practices Act ("Act") creates a private action for an aggrieved party and includes provisions for the awarding of treble damages and, in appropriated cases, attorney fees. *ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 47–48 (4th Cir. 1983). Section 75–1.1 of the Act provides, in sweeping language, that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." In deciding defendants' motion to dismiss, the court must determine whether section 75–1.1 is available to a foreign plaintiff suing a resident defendant over alleged foreign injuries having a negligible effect, if any, on North Carolina trade or commerce. This determination requires the court to undertake a two-part analysis: (1) Are the facts within the intended scope of the Act; (2) Would an application of the Act violate the United States Constitution. *See American Rockwool, Inc. v. Owens-Corning Fiberglas*, 640 F.Supp. 1411, 1427 (E.D.N.C.1980). *See also Vishay Intertechnology, Inc. v. Delta Intern. Corp.*, 696 F.2d 1062, 1064 (4th Cir.1982)(two-part test for determining whether court has personal jurisdiction: whether facts within states long-arm statute and whether exercise of jurisdiction comports with due process); *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 231 S.E.2d 629 (1977)(same).

Looking at the intended scope of section 75–1.1, the court notes that before 1977 the section was specifically limited to dealings "within this state." *Rockwool*, 640 F.Supp.

at 1427. The General Assembly deleted this geographical limitation in 1977, and the courts have determined that the General Assembly sought thereby to expand the coverage of section 75–1.1 to the limits of section 1–75.4(4) of the North Carolina long-arm statute. *See Id. See also Dowles v. Warren-Rupp Houdailles, Inc.*, 800 F.2d 1305 (4th Cir.1986)(interpreting *Vishay*, 696 F.2d at 1067, as treating violations of § 75–1.1 as a claim of injury under the long-arm statute § 1–75.4(4)). Section 1–75.4(4) allows personal jurisdiction over defendants in a case involving foreign acts *if an injury* to person or property *occurs within North Carolina* and, at or about the time of the injury, the defendants were either working in North Carolina or had products in the North Carolina commerce through the ordinary course of business. Thus, section 1–75.4(4), as applied to defining the reach of 75–1.1, requires an in-state injury to plaintiff before plaintiff can state a valid unfair trade claim.

The requirement of an in-state injury to plaintiff is in harmony with the courts' practice of interpreting 75–1.1 by reference to federal antitrust laws.[7] *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521 (1973)(Sherman Act decisions instructive in determining the full reach of North Carolina's unfair trade act). As previously discussed, the Sherman Act reaches foreign conduct having a substantial effect on a plaintiff's domestic business operations. By analogy, section 75–1.1 arguably extends to foreign conduct having a substantial effect on plaintiff's business operations in North Carolina. This formulation closely resembles the formulation arrived at by reference to section 1–75.4(4) of the long-arm statute and thereby reinforces the position that section 75–1.1 applies only if the plaintiff alleges an in-state, injurious effect

---

**6.** Although plaintiff filed a response to defendants' motion to dismiss, plaintiff did not include in its response any arguments specifically countering defendants' contentions that the section 75–1.1 claim is meritless.

**7.** Commentators agree the North Carolina's unfair trade practices act "grew out of antitrust laws". *Lindner v. Durham Hosiery Mills, Inc.*,

761 F.2d 162, 165 (4th Cir.1985). The Act's substantive provisions are "reproduced *verbatim* from § 5 of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(a)(1)." *ITCO*, 722 F.2d at 48. A violation of FTCA § 5 amounts to a violation of the Sherman Act; consequently, a violation of the Sherman Act violates North Carolina's unfair trade practices act. *Id.*

on his business operations in North Carolina. *Cf. United Virginia Bank v. Airlift Assoc.*, 79 N.C.App. 315, 339 S.E.2d 90, 93, (1986)("the purpose of G.S. 75–1.1 is to provide a civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public *within this state....*") (emphasis added).

While reference to section 1–75.4(4) limits the applicability of section 75–1.1 to cases having an in-state effect on plaintiff's business operation, reference to the Sherman Act further limits the applicability of section 75–1.1 to cases having a *substantial* effect on plaintiff's in-state operations. As discussed below, the court determines that the requirement of a substantial effect on plaintiff's in-state operations is in accord with the provisions of the United States Constitution.

State statutes may not impose an undue burden on interstate commerce. "Not every exercise of state power with some impact on interstate commerce is invalid." *Edgar v. MITE Corp.*, 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982). The Fourth Circuit has held that the North Carolina unfair trade act is valid under the commerce clause:

> Absent some reason to believe that the North Carolina act is an attempt directly to regulate interstate commerce, and is not an act designed to address primarily local concerns which happen to have an occasional incidental, but not excessive, effect upon interstate commerce, we perceive no cause for constitutional concern.

*ITCO*, 722 F.2d at 48 n. 9. The Fourth Circuit thus construes the Act as addressing "primarily local concerns". *Cf. Rockwool*, 640 F.Supp. at 1428 (application of Act justified by "substantial local interests"). Application of the Act in cases having only an incidental local effect not only would be contrary to the Fourth Circuit's interpretation of the Act, but also would render the Act constitutionally suspect. The commerce clause mandates that the Act's extraterritorial application be jus-tified by local concerns and not be excessively burdensome on interstate commerce. The court believes that limiting the scope of the act to cases involving substantial effect on a plaintiff's in-state business operation is consistent with, and perhaps required by, the commerce clause.

Such a limitation of section 75–1.1 is also consistent with the due process clause. Before North Carolina's substantive law can be applied, North Carolina must have a sufficient state interest in the litigation such that application of North Carolina's law is "neither arbitrary nor unfair". *Rockwool*, 640 F.Supp. at 1427; *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 312–13, 101 S.Ct. 633, 639–40, 66 L.Ed.2d 521 (1981). Section 75–1.1 is broadly worded and arguably encompasses "any conduct that a court of equity would consider unfair." *Polo Fashions, Inc. v. Craftex Inc.*, 816 F.2d 145, 148 (4th Cir.1987). In addition, a victorious plaintiff under this section could receive treble damages and attorney fees. Such a sweeping, punitive cause of action should not be given an extended extraterritorial reach, lest notions of fairness be clipped. *See United States Bank*, 339 S.E.2d at 95 (court notes that trial court found § 75–1.1 to be unconstitutional because of "vagueness and inadequate notice and hearing procedures"). To extend the Act's coverage to every occasion where foreign conduct has an effect in North Carolina is potentially to subject defendants, quite unaware of the Acts existence and punitive punch, to unfair treatment. For these reasons, limiting the sections reach to cases involving a substantial effect on plaintiff's operations in North Carolina comports with the notion of fairness under the due process clause.[8]

Plaintiff admits that its business operations are restricted to France and that it does not have any business operations in North Carolina. Lacking substantial North Carolina effects, plaintiff's claim falls outside the reach of 75–1.1 and is accordingly

---

**8.** Finally, the court notes the anamoly that would be created if section 75–1.1, a state stat-ute, were construed to have a greater extraterritorial reach than the Sherman Act.

dismissed pursuant to Fed.R.Civ.P. 12(b)(6).[9]

### 3) Defendants' Motion to Dismiss Plaintiff's Contract and Interference with Contract Claims

■ In reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court accepts as true the allegations of the complaint. *Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir.1982). A complaint should not be dismissed "unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." *Johnson v. Mueller*, 415 F.2d 354, 355 (4th Cir.1969). Although the parties have submitted affidavits in support of their respective positions, the court did not consider the affidavits in deciding this motion. Accordingly, the court does not convert the dismissal motion into a summary judgment motion (*See* Fed.R.Civ.P. 12(b)), leaving for another day review of additional dispositive motions.

Defendants contend that they are not parties to the alleged distributorship contract and that any contract, if formed and binding in the first instance, is between plaintiff and Hanes International. Plaintiff, however, contends that it formed a contract with defendants and alleges facts which, if proven, would tend to substantiate its contention. Specifically, plaintiff alleges that Keith Alm, on behalf of defendants, offered plaintiff an exclusive distributorship contract which, upon acceptance by plaintiff, formed a binding contract. Plaintiff lists a number of terms of the alleged contract as well: in addition to duration and notice terms, plaintiff agreed to cease distribution of competing products and defendant agreed to grant plaintiff an exclusive distributionship right to Hanes products in L'lle France. In the alternative, plaintiff argues that defendants exercised so much control over Hanes International that defendants are answerable for contract claims against Hanes International. If true, plaintiff's allegations might provide a basis for recovery. Factual determinations related to whether the parties formed a contract, whether defendants are a party to the alleged contract, and whether defendants exercised such control over Hanes International as to be liable for a breach of contract caused by Hanes International, are not appropriate at this stage. Accordingly, the court denies defendants' 12(b)(6) motion to dismiss plaintiff's contract claim.

■ Next, defendants contend that plaintiff's interference with contract claim should be dismissed under 12(b)(6). To subject defendants' to liability for tortious interference with contract, plaintiff must allege and prove these essential elements:

First, that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. Second, that the outsider had knowledge of the plaintiff's contract with the third person. Third, that the outsider intentionally induced the third person not to perform his contract with the plaintiff. Fourth, that in so doing the outsider acted without justification. Fifth, that the outsider's act caused the plaintiff actual damages.

*Wilson v. McClenny*, 262 N.C. 121, 132, 136 S.E.2d 569, 577–78 (1964), quoting *Childress v. Abeles*, 240 N.C. 667, 674, 84 S.E.2d 176, 181–82 (1954); *Williams v.*

**9.** The court dismisses plaintiff's claim as not being within the contemplated reach of section 75–1.1. Arguably, the court could have dismissed the claim pursuant to North Carolina's choice of law rules, based on a finding that the facts dictate that French law, rather than North Carolina law, governs the occurrence in question. The North Carolina Supreme Court has not determined the appropriate test for deciding the applicable law when plaintiff raises a section 75–1.1 claim. The decisions interpreting North Carolina's choice of law rules are in conflict on whether to use the law of the jurisdiction where the last act occurred giving rise to injury (*lex loci*) or the jurisdiction having the "most significant relationship" to the occurrence giving rise to the claim. *Rockwool*, 640 F.Supp. at 1429–34 (1986) (most significant relationship); *United Virginia Bank v. Air-lift Assoc., Inc.*, 79 N.C.App. 315, 339 S.E.2d 90 (1986) (*lex loci*); *Andrew Jackson Sales v. Bi-Lo Shoes*, 68 N.C.App. 222, 314 S.E.2d 797 (1984) (most significant relationship test); *Itco*, 722 F.2d at 49–50 n. 11 (4th Cir.1983) (*lex loci*); *Santana, Inc. v. Levi Strauss and Co.*, 674 F.2d 269 (4th Cir. 1982) (most significant relationship).

*State Farm Mut. Auto. Ins. Co.,* 67 N.C. App. 271, 312 S.E.2d 905, 907 (1984); *American Hot Rods Ass'n, Inc. v. Carrier,* 500 F.2d. 1269 (4th Cir.1974). *See* North Carolina Pattern Jury Instructions Civil 807.00.

Defendants argue that dismissal of plaintiff's interference of contract claim is proper for two reasons: (1) in light of plaintiff's allegation that a contract was formed between plaintiff and defendants, plaintiff can not take "the ludicrous position" that defendants interfered with a contract to which they were allegedly parties; (2) plaintiff alleged only an *anticipatory* breach of contract, whereas North Carolina law requires an actual breach of contract to sustain an interference with contract claim. Defendants first argument fails to recognize that under Fed.R.Civ.P. 8(e)(2) alternative pleadings are permissible. Thus, it was proper for plaintiff to allege that defendants either breached the distributorship contract or tortiously interfered with a contract between plaintiff and Hanes International. Defendants second argument fails to recognize that an anticipatory breach of a contract is a breach of contract. Farnsworth, CONTRACTS § 8.20 n. 2 (anticipatory breach means a "*breach* by anticipatory repudiation")(emphasis added). Thus, if defendants tortiously interfered with the distributorship contract and thereby caused an anticipatory breach of the contract, then plaintiff might prevail on its interference with contract claim. Defendant therefore has not demonstrated under 12(b)(6) that plaintiff will certainly fail on its interference with contract claim. Accordingly, the court denies defendants' motion to dismiss.

### 4) Defendants' Motion to Dismiss Based on the Doctrine of Forum Non Conveniens

■ The doctrine of forum non conveniens provides a basis for dismissing an action, in the discretion of the district judge, upon a showing by the defendant that another forum is "more appropriate". *Kontoulas v. A.H. Robins Co.,* 745 F.2d 312, 315 (4th Cir.1984). If the more appropriate forum is a federal forum, the court may transfer the case pursuant to 28 U.S.C. § 1404(a). "Where the alternative forum is a state court or a court of a foreign country, however, the court ... may dismiss the action." *Hodson v. A.H. Robins Co.,* 528 F.Supp. 809, 816 (E.D.Vir. 1981). The burden is on the defendant to show that a "particular other forum" is more appropriate. *Kontoulas,* 745 F.2d at 315. "Whether a motion to dismiss on the ground of forum non conveniens should be granted or denied is matter entrusted to the discretion of the district judge." *Hodson v. A.H. Robins Co.,* 715 F.2d 142, 144 (4th Cir.1983). *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266–67, 70 L.Ed.2d 419 (1981). *See Kontoulas,* 745 F.2d at 314 (standard governing review of district court decision on a forum non motion is abuse of discretion). The district judge, however, has less latitude to dismiss a case under forum non conveniens than to transfer a case under section 1404(a), for "in determining the [forum non] issue a court decides whether it should decline to exercise jurisdiction in an instance where it has jurisdiction and venue." *Liamuiga Tours v. Travel Impressions, Ltd.,* 617 F.Supp. 920, 929 (D.C.N.Y.1985). *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504–07, 67 S.Ct. 839, 840–42, 91 L.Ed. 1055 (1947). *See Piper,* 454 U.S. at 253, 102 S.Ct. at 264–65. Thus, "dismissal must be based on a finding that ... the relevant public and private interests strongly favor a specific, adequate, and available alternative forum." *Kontoulas,* 745 F.2d at 315, quoting *Veba-Chemie A.G. v. M/V Getafix,* 711 F.2d 1243, 1245 (5th Cir.1983).

The Supreme Court, in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), prescribed the relevant public and private interests a court should balance in deciding a forum non conveniens motion. The factors pertaining to the private interests of the litigants include "the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make

trial of a case easy, expeditious and inexpensive." The public factors include the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; "the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty."

In 1981 the Supreme Court refined the forum non conveniens inquiry in *Piper v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The Court stressed that convenience is the central focus of the forum non inquiry and that the district court should adopt a flexible approach in undertaking the inquiry. *Piper*, 454 U.S. at 249, 102 S.Ct. at 262–63. In *Piper* the lower court held that dismissal is "automatically barred if it would lead to a change in the applicable law unfavorable to the plaintiff." *Id.* at 246, 102 S.Ct. at 261. Finding such an approach too rigid, the Supreme Court reversed and held that "the possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry." *Id.* at 247, 102 S.Ct. at 261. Inherent in the Court's treatment of forum non conveniens is that a party should select a forum to maximize convenience, not to gain favorable law. Thus, the Court stated that "dismissal may be warranted where a plaintiff chooses a particular forum, not because it is convenient, but solely in order to harass the defendant or take advantage of favorable law." *Id.* at 249 n. 15, 102 S.Ct. at 262 n. 15. When a plaintiff chooses its home forum, there is generally a presumption that the forum is convenient, and dismissal based on forum non conveniens is thus rarely appropriate. *Id.* at 255–256, 102 S.Ct. at 265–266. "When the plaintiff is foreign, however, this assumption [that the selected forum is convenient] is much less reasonable." *Id.* Accordingly, "a foreign plaintiff's choice [of forum] deserves less deference." *Id. See Hodson v. A.H. Robins Co.*, 715 F.2d 142, 144 ("for-

eign plaintiffs' choice of an American forum ... entitled to little weight").

■ In the instant case, the court denies defendants' motion to dismiss. To prevail on its motion, defendants must initially establish the existence of an alternative, available forum. "Ordinarily, this requirement will be satisfied when the defendant is amenable to process in the other jurisdiction." *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22. Defendants have not presented an alternative forum, nor have defendants stated that they are amenable to process in another forum. Even assuming that France represents a forum where defendants are amenable to process, defendants have not met their burden of demonstrating, based on the calculus of convenience factors, that France is a more convenient forum.

Looking at the private interest factors, the court initially points out that Defendant Hanes has its principal place of business within this judicial district, in Winston-Salem, North Carolina, and manufactures in this district the outerwear plaintiff distributes. While defendants emphasize the difficulty in obtaining foreign witnesses, plaintiff counters that six out of the seven witnesses it anticipates using at trial are located within this district. Based on the evidence before the court, the private convenience factors appear to be equipoise.

Looking at the public convenience factors, the court first notes that it has the time and resources to efficiently resolve the dispute; the court foresees no "administrative difficulties" related either to court congestion or enforcement of a judgment. In addition, the case has sufficient local ties such that a jury would not be burdened with a case totally unrelated to its locality. The products distributed in France are manufactured in this district by a local defendant, and the parties partially negotiated the alleged distributorship contract in this district. As to the applicable law, the court lacks enough evidence about where the contract was formed to determine the proper law. Even if French law does apply, dismissal based on forum non conveniens is not required, since application of

**506**

foreign law is just one factor in the balancing process. *Hodson v. A.H. Robins Co.*, 528 F.Supp. 809, 823 (E.D.Vir.1981), affirmed 715 F.2d 142 (4th Cir.1983) (denial of forum non motion proper despite fact that court would have to apply British law). In sum, defendants failed to sustain their burden of pointing to another, more convenient forum.

### CONCLUSION

The court dismisses plaintiff's antitrust claims for a lack of subject matter jurisdiction and dismisses plaintiff's unfair trade practice claim for failure to state a claim upon which relief can be granted. The court denies defendants' forum non conveniens motion and denies defendants' motion to dismiss plaintiff's breach of contract and interference with contract claims. Accordingly, an order will be entered.