**FERRUZZI ITALIA, S.p.A.**

v.

**TRADE & TRANSPORT, INC., et al.**

**Civ. A. No. JFM–87–565.**

United States District Court, D. Maryland.

March 3, 1988.

Thomas M. DiBiago, Semmes, Bowen & Semmes, Baltimore, Md., David A. Nourse, Nourse & Bowles, New York City, for plaintiff.

Donald C. Greenman, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for defendants.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff, Ferruzzi Italia, S.p.A. (an Italian company), claims that defendants, Avgi Maritime Co., Ltd., and Trade & Transport, Inc., (both of which are Greek companies) failed to supply a ship, the M/V TRADE CARRIER, pursuant to a charter agreement between the parties. Plaintiff asserts that it suffered damages in the amount of $78,000 as the result of defendants' breach. Plaintiff seeks to enforce a clause in the alleged agreement calling for disputes to be arbitrated in London. Defendants have filed a motion to dismiss on *forum non conveniens* grounds. The motion will be denied.

## FACTS

In the fall of 1986 Avgi, the owner of the TRADE CARRIER, and its agent Trade and Transport negotiated with Ferruzzi and its broker CAEMI regarding the charter of the TRADE CARRIER by Ferruzzi. Avgi and Trade and Transport occupy the same office in Piraeus and have overlapping personnel. Ferruzzi's principal offices are in Ravenna. Ferruzzi wished to charter the TRADE CARRIER to transport grain from the United States to Italy. In mid-November 1986, just before it needed the vessel, Ferruzzi sought to "fix" the previous negotiations with Avgi and Trade and Transport.

At the heart of this dispute are a series of telephone calls and telexes that were exchanged on November 18 and 19. The first in the series, sent at 1:11 p.m. on November 18, 1986 (apparently by CAEMI) states in some detail the terms for charter-

ing the TRADE CARRIER.[1] The charter was to begin almost immediately. The telex is headlined "RECAP TERMS AGREED," but also states, three lines later, "SUB STEM/SHIPPERS APPROVAL TDY 1700 HRS." The meaning of the last language was that the fixture of the contract was subject to the confirmation by plaintiff of "stem," i.e., the availability of cargo and the shipper's approval of the vessel. The telex also provided for arbitration in London. A telex sent by CAEMI to Trade and Transport approximately seven hours later, at 7:43 p.m., details, from Ferruzzi's point of view, the development of the dispute. This telex summarizes a series of telephone conversations. According to its account, Ferruzzi confirmed the stem ("GIVEN YOU THE SUBS") at 4:55, but had at the same time expressed concern because the captain of the vessel had indicated that the holds not been entirely cleaned. In two telephone calls made during the next hour CAEMI pressed without success, according to the telex, for more information about the holds. The telex concluded: WE HAVE LEARNT NOW THAT YOU HAVE CHANGED YOUR ATTITUDE AND SAYIN GTHAT (sic) SUBS HAVE NOT BEEN LIFTED AND VSL NO LONGER BELONGS TO CHRTS [charterers] AS PER FIXTURE AND YOUR BINDING TERMS/AGREEMENT. The telex then warned that if the vessel were not delivered to Ferruzzi "AS STEMMED," Ferruzzi would charter a different ship and charge the extra cost to defendants.

Trade and Transport responded to this telex with a telex of its own on the following day, at 12:38 p.m. This telex asserted that the first telephone call referred to in Ferruzzi's telex occurred after 5:00 p.m., and that Ferruzzi therefore failed to satisfy the conditions of the contract. According to the account in the Trade and Transport telex, Trade and Transport informed Ferruzzi of this failure to meet the conditions contained in the contract during a

second telephone call at 5:25 p.m., and reiterated this position at 6:30 p.m. Trade and Transport's telex also implied, in recapitulating the telephone conversations, that Ferruzzi had been pressing so repeatedly about the condition of certain holds because it wanted to load the ship within the port of Mobile, instead of in the Gulf, as originally contemplated. During the 6:30 telephone conversation CAEMI allegedly agreed to use the method of loading previously discussed, but Trade and Transport told CAEMI that this decision came too late, and that the ship was no longer committed to Ferruzzi.

A final series of telephone calls took place about 5:00 p.m. on November 19. These were summarized in a telex sent by CAEMI at 5:55 p.m. According to this telex, Trade and Transport offered to lease the TRADE CARRIER, but at steeper terms than originally contemplated. CAEMI responded that Ferruzzi had leased a different vessel, and had turned the dispute over to its lawyers.

While these telexes, and the telephone calls they describe, apparently originated from Greece and Italy, the telexes also refer to calls made to the United States. In its telex of November 19 Trade and Transport stated that it promised, during the 5:10 p.m. (by its calculation) and 5:25 p.m. telephone calls, to "INVESTIGATE STATUS AT MOBILE WHERE VSL DISCH." This refers, presumably, to efforts to find out whether the vessel had properly been cleaned. Ferruzzi's summary of the telephone calls states that Trade and Transport agreed to check with the ship's captain, U.S. officials, and "WITH NYORK," where Trade and Transport had an agent. A Trade and Transport telex sent several days earlier had emphasized the need to "KEEP US/OUR NY OFFICE CLOSELY ADVISED" of the contacts from Ferruzzi regarding the TRADE CARRIER.[2]

1. All times given are, apparently, Italian time.

2. While defendants deny that Brokerage and Management, Trade and Transport's New York agent, had any significant involvement in the negotiations with Ferruzzi, an affidavit submitted by Dimitri Papoutsakis, who conducted much of the negotiating for Trade and Transport, shows that Brokerage and Management did play some role. Papoutsakis states in his affidavit that "during the time frame of the

On March 13, 1987 Ferruzzi filed its complaint against defendants for breach of a maritime contract. The TRADE CARRIER was then discharging cargo at the Bethlehem Steel Sparrows Point Ore Pier, and Ferruzzi sought a maritime attachment and garnishment of the ship, under the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, Rule B(1). Ferruzzi obtained the attachment and garnishment, which was lifted later the same day when defendants furnished satisfactory security. Defendants entered their appearance to respond to the claim against them under Supplemental Rule E(8) (Restricted Appearance). In their motion to dismiss defendants state that they "are prepared to submit to jurisdiction in London, England, the proper forum, and to provide equivalent security for the plaintiff's claim in that jurisdiction."

## DISCUSSION

The Supreme Court outlined the rationale for and nature of the doctrine of *forum non conveniens* in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute. These statutes are drawn with a necessary generality and usually give a plaintiff a choice of courts.... But the open door may admit those who seek not simply justice but perhaps justice blended with some harassment. A plaintiff sometimes is under temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself.

330 U.S. at 507, 67 S.Ct. at 842. While the Supreme Court stressed the extent of the discretion in the district court, it also outlined the factors that courts should consider.

Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

330 U.S. at 508, 67 S.Ct. at 843. The Court also stated that "[t]here is an appropriateness ... in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in ... law foreign to itself." 330 U.S. at 509, 67 S.Ct. at 843. The application of the doctrine "presupposes at least two forums in which the defendant is amenable to process." 330 U.S. at 507, 67 S.Ct. at 842.

In *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) the Supreme Court reaffirmed and restated the rule of *Gilbert.* The doctrine of *forum non conveniens* applies, the Court stated, "where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of con-

Ferruzzi negotiations, I probably did talk to Brokerage & Management about various matters, as Brokerage & Management are subagents of Trade & Transport. Undoubtedly, I told Brokerage & Management that I was negotiating the TRADE CARRIER with Ferruzzi. In fact, on one weekend I could not be reached at home ..., so I told Ferruzzi's broker to relay any messages to me via Brokerage & Management.... However, it was exclusively Trade & Transport in Piraeus who was responsible for, and who conducted, the negotiations with Ferruzzi's broker."

venience supporting his choice." 454 U.S. at 249, 102 S.Ct. at 262. The rule was particularly designed to prevent harassment of defendants. 454 U.S. at 249 n. 15, 102 S.Ct. at 262 n. 15. The court also noted that courts may consider the burden of having to decipher foreign law, and in fact reinstated a district court dismissal that was based in part on the district court's "lack of familiarity with Scottish law." 454 U.S. at 260, 102 S.Ct. at 268. While the *Piper Aircraft* decision reaffirmed the *Gilbert* Court's holding that there is usually a strong presumption in favor of the plaintiff's choice of forum, to some extent it qualified this rule with respect to plaintiffs that are foreign to the jurisdiction. Thus, it stated, "because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." 454 U.S. at 256, 102 S.Ct. at 266.

*Burden on the Defendants*

■ As the previous discussion shows, the question of convenience for the parties is the principal focus of a *forum non conveniens* inquiry. There exists a presumption in favor of the forum chosen even when the plaintiff is foreign, and the defendant therefore has the initial burden of showing that the forum chosen is inconvenient, and that another forum exists. Since employment of the doctrine of *forum non conveniens* is premised on the existence of an alternative forum, *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 507, 67 S.Ct. at 842, a defendant must show not merely that the current forum is inconvenient, but that the alternative forum it suggests is more convenient. *See Kontoulas v. A.H. Robins Co., Inc.*, 745 F.2d 312, 315 (4th Cir.1984) ("We consider first the motion under the common law *forum non conveniens* as it relates to the Australian and Canadian plaintiffs. *Forum non conveniens* is a doctrine available to courts considering alternative fora outside the United States. The only question for us to decide is whether, under that doctrine, the defendants met their burden of showing not only that Maryland was not the best forum, but that a particular other forum was *more appropriate*.").

To support their claim that this Court is an inconvenient forum, defendants argue that:

(1) The parties are all foreign,

(2) The persons participating in the negotiating conversations and the critical conversation in which the "subjects" either were or were not lifted were located in Italy and Greece,

(3) Neither the plaintiff nor the defendants are located in this forum...., [and]

(4) The proposed transaction and voyage were to have no contact with this forum.

All of these arguments apply as well to the forum defendants contend is most appropriate—London. None of the parties are English or located in England, none of the negotiations took place in England, and the proposed transaction and voyage had no contact with England or the U.K.

■ Defendants also suggest that it would be less costly to transport witnesses to London than to Baltimore. However, plaintiff has submitted figures comparing the costs of air fare from Athens to London and to Baltimore and hotel accommodations for four days in London and Baltimore, and these figures indicate that the cost savings per person of a trial in London would be approximately $150. This difference in cost is *de minimus*, especially since, according to defendants' answers to interrogatories, no more than two individuals associated with defendants had any knowledge or were involved in any way in the TRADE CARRIER negotiations with plaintiff. Moreover, there are grounds for believing that trial in the United States might be more convenient for the parties. Although defendants contend to the contrary, it is not at all clear that defendants' agent in New York was uninvolved in the negotiations concerning the TRADE CARRIER. Nor is it clear that the condition of the TRADE CARRIER'S holds— which might involve the taking of depositions in Mobile—will not be an issue. "Stemming" involves, by defendants' own account, the cargo supplier's confirmation that a vessel is acceptable, and the condi-

tion of the holds might bear directly upon this question.[3]

*Burden on the Court*

 Defendants also contend that dismissal is warranted because of the burden which this action places upon this Court. As a general matter, it points to the fact that this is "purely foreign litigation." The short answer to this contention is that the United States is part of the world community and that its federal courts should be open to foreign litigants engaged in commerce in the United States where the balance of other factors does not suggest a more convenient forum.

 More specifically, defendants argue that the parties' choice of London as an arbitration site indicates that the parties chose to have English law govern their relationship, and that this Court will be unduly burdened by being asked to resolve questions of English law. Assuming that defendants are correct that the parties made an implicit choice of English law, *see generally* Restatement (2d) of Conflicts of Laws, Section 218, comment b(1971), this fact alone does not justify dismissal of this action in favor an English forum. *See, e.g., Schexnider v. McDermott International, Inc.,* 817 F.2d 1159, 1163 (5th Cir.) *cert. denied* — U.S. ——, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *Manu International S.A. v. Avon Products, Inc.,* 641 F.2d 62, 68 (2d Cir.1981); *The 'In' Porters, S.A. v. Hanes Printables, Inc.,* 663 F.Supp. 494,

505–06 (M.D.N.C.1987); *see also Hodson v. A.H. Robins Co.,* 715 F.2d 142, 144 (4th Cir.1983). Here, the legal issues presented are straightforward and require no "untangling" of complexities. *Compare Gulf Oil Co. v. Gilbert,* 330 U.S. at 509, 67 S.Ct. at 843; *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 881 (2d Cir.1978).[4]

A separate order is being entered herewith denying defendants' motion.

---

**3.** There is some inconsistency in the testimony of defendants' own representatives concerning the materiality of the question of the condition of the holds. In his affidavit Dimitri Papatsoukis asserts that the inquiries regarding the condition of the holds had "nothing whatsoever to do with whether or not there was a binding contract or whether or not the plaintiff failed to fulfill the agreed conditions on time. There is not the remotest need for American stevedores or inspectors to give any evidence about these issues." However, the deposition of Basil Koutsis, the President of Avgi and Trade and Transport, suggests that the condition of the holds was of significance in the negotiations: "we were interested to find out the condition of the holes [sic] which was vital question in order to proceed with the negotiations."

**4.** It should also be noted that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which has been adopted by Congress, fully supports the exercise of this Court's jurisdiction here. The Convention applies to maritime transactions between parties at least one of whom is not an American citizen. 9 U.S.C. Section 202. It provides that courts "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within *or without the United States.*" 9 U.S.C. Section 206. (emphasis added) This implies, of course, that a court of the United States may be called upon to rule upon the enforceability of a contract which, like the one here, specifies arbitration outside of the United States. *Cf. Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186–87 (1st Cir.1982).