LITHUANIAN COMMERCE CORPO-
RATION, LTD., Plaintiff and
Counterclaim Defendant,

v.

SARA LEE HOSIERY, Sara Lee Ho-
siery International, Sara Lee Interna-
tional and Sara Lee Corporation, De-
fendants and Counterclaim Plaintiffs,

v.

Algis Vasys and Laima Zajanck-
auskiene, Additional Coun-
terclaim Defendants.

Civil Action No. 96–1949.

United States District Court,
D. New Jersey.

April 23, 1999.

Gregory D. Saputelli, James R. Thompson, Obermayer, Rebmann, Maxwell & Hippel, LLP, Haddonfield, NJ, for Lithuanian Commerce Corporation Ltd., and Additional Counterclaim Defendants, Algis Vasys and Laima Zajanckauskiene.

Carl W. Hittinger, Stevens & Lee, PC, Philadelphia, PA, Neil C. Schur, Stevens & Lee, PC, Cherry Hill, NJ, for Sara Lee Hosiery, Sara Lee Hosiery Intern., Sara Lee Intern. and Sara Lee Corp.

## OPINION

ORLOFSKY, District Judge.

This case, involving an acrimonious dispute between the manufacturer of L'eggs® pantyhose and one of its distributors, has generated numerous motions, four published opinions,[1] six weeks of trial testimony, and now it is almost at an end. This opinion is, hopefully, dare I say it, my "last L'eggs." The history of this epic litigation is set forth in great detail in the four published opinions which have been filed in this case and will not be repeated here.

At the opening of their case on their Counterclaims, Defendants and Counterclaim Plaintiffs, Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, and Sara Lee Corporation (collectively, "Sara Lee"), the manufacturer of L'eggs pantyhose, "withdr[e]w the damage claims under the counterclaim[s]," Trial Tr. at 2522, and elected to seek only injunctive relief.[2] *See id.* at 2522, 2615. Accordingly, Sara Lee's Counterclaim and Third–Party Complaint (collectively, "Counterclaims") were tried before the Court, rather than the jury. As a result, I must now make findings of fact and conclusions of law with respect to Sara Lee's Counterclaims pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[3]

Additionally, Plaintiff and Counterclaim Defendant, Lithuanian Commerce Corpation, and Additional Counterclaim Defendants, Algis Vasys and Laima Zajanckauskiene (collectively, "LCC"), the exclusive distributor of L'eggs® pantyhose in several Eastern European countries, moved, during their closing argument on Sara Lee's Counterclaims, for judgment as a matter of law, *see* Trial Tr. at 2653–54, pursuant to Rule 52(c)[4] of the Federal Rules of Civil Procedure.[5]

---

1. *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 23 F.Supp.2d 509 (D.N.J.1998) (Orlofsky, J.); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450 (D.N.J.1998) (Orlofsky, J.); *Lithuanian `Commerce Corp. v. Sara Lee Hosiery*, 177 F.R.D. 245 (D.N.J.1997) (Rosen, M.J.); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 177 F.R.D. 205 (D.N.J.1997) (Orlofsky, J.).

2. Sara Lee withdrew its claims for damages immediately after I granted its motion for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure, on the claims of Plaintiff, Lithuanian Commerce Corporation. *See Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 23 F.Supp.2d 509 (D.N.J. 1998).

3. Rule 52(a) provides, in part:
   In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon,

and judgment shall be entered pursuant to Rule 58.

4. Rule 52(c) provides:
   If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without favorable finding on that issue, or the court may decline to render any judgment until the close of all evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

5. LCC actually moved for judgment as a matter of law under Rule 50, *see* Trial Tr. at 2653–54, which permits the court to enter judgment as a matter of law before or during a jury trial. Since Sara Lee only seeks in-

This Court asked LCC "to formalize" its motion for judgment as a matter of law. *See* Trial Tr. at 2659. As a result, LCC filed its written motion for judgment as a matter of law on November 20, 1998,[6] accompanied by its Proposed Findings of Fact and Conclusions of Law. Sara Lee filed its Proposed Findings of Fact and Conclusions of Law on November 20, 1998, and its opposition to LCC's motion for judgment as a matter of law on December 18, 1998. LCC filed a brief in reply to Sara Lee's opposition on January 4, 1999.

Sara Lee has asserted four counterclaims, namely: (1) a violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[7] which prohibits the use of unfair trade practices; (2) a violation of the North Carolina Unfair Trade Practices Act, N.C. Gen.Stat. § 75–1.1,[8] which also prohibits unfair trade practices; (3) negligent misrepresentation; and (4) trade libel. In these four counterclaims, Sara Lee essen-

junctive relief and attorneys' fees on its counterclaims, *see* Trial Tr. at 2522, the counterclaims require a bench trial and not a jury trial. As a result, LCC's motion is properly made pursuant to Rule 52(c), which governs judgment as a matter of law in bench trials, and not Rule 50, which concerns judgment as a matter of law in jury trials. Because I must construe the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of" this action, *see* Fed.R.Civ.P. 1, I shall treat LCC's motion as a motion made pursuant to Rule 52(c), rather than Rule 50. To do otherwise would exalt form over substance.

Further, Sara Lee argues that "LCC's motion is procedurally deficient[, because] LCC has filed its motion *after the trial.*" Sara Lee's Memorandum of Law in Opposition to LCC's Motion for Judgment as a Matter of Law, filed Dec. 18, 1998, at 5. LCC made its motion during its closing argument, which is a part of the trial, and, therefore, LCC has complied with the procedural requirements of Rule 52(c). Moreover, LCC's motion requires the Court and Sara Lee to address the same issues that must be addressed for the Court to make findings of fact and conclusions of law. Thus, Sara Lee will not be prejudiced and the Court will not be inconvenienced by treating LCC's motion as made under Rule 52(c). Given the posture of this case, the result would be no different if my findings of fact and conclusions of law were made pursuant to Rule 52(a).

6. It is of no moment that LCC did not move for judgment on the Third–Party Complaint, filed by Sara Lee on April 14, 1997, against Vasys and Zajanckauskiene, because this Court converted Sara Lee's Third–Party Complaint into a counterclaim in its Opinion of June 29:

Although Sara Lee denominated Vasys and Zajanckauskiene as "Third–Party Defendant[s]," see Sara Lee's Counterclaim and Third–Party Complaint at ¶¶ 8, 9, they are properly before this Court only as counterclaim defendants because their liability is not derivative of Sara Lee's liability to LCC. *Compare* Fed.R.Civ.P. 13(h) *with* Fed. R.Civ.P. 14(a); *see, e.g., Federal Deposit Insurance Corp. v. Bathgate*, 27 F.3d 850, 873 (3d Cir.1994). The caption of this matter shall reflect this correction.

*Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 454 n. 1 (D.N.J.1998). Accordingly, I shall treat LCC's motion as seeking judgment as a matter of law on all of Sara Lee's claims.

7. Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), provides, in relevant part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

8. The North Carolina Unfair Trade Practices Act provides, in relevant part: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen.Stat. § 75–1.1.

tially alleges that LCC repeatedly and falsely or misleadingly advertised to consumers and represented to the Lithuanian and Latvian governments that L'eggs® pantyhose assist in the prevention of varicose veins. Quixotically, Sara Lee presented no testimony to prove this allegation. Instead, it relied solely upon the evidence introduced during LCC's case-in-chief and additional exhibits admitted into evidence for the purpose of the Court's consideration of the Counterclaims. *See* Trial Tr. at 2522.

In its Rule 52(c) motion, LCC asserts, *inter alia*, that Sara Lee has failed to meet its burden of proving that: (1) L'eggs® pantyhose do not have the therapeutic qualities advertised by LCC; and (2) Sara Lee suffered any injury as a result of the alleged misrepresentations and false advertising. LCC argues that, because Sara Lee has failed to meet its burden of proof on at least two essential elements of all four of its counterclaims, it cannot recover under any of its four claims.

Based on my findings of fact and conclusions of law, and for the reasons set forth below, I find that Sara Lee has not presented any evidence that it suffered any harm whatsoever as a result of LCC's alleged false advertising and misrepresentations. I further find that, even if Sara Lee had offered proof of its alleged injuries, Sara Lee has failed to demonstrate that those injuries were caused by LCC's alleged misrepresentations. Finally, I find that Sara Lee has failed to meet its burden of proof in demonstrating that the alleged misrepresentations made by LCC in its advertisements were false, misleading, or disparaging. Thus, Sara Lee has failed to meet its burden of proof on at least one of the essential elements of each of its Counterclaims. Accordingly, I will grant LCC's motion for judgment as a matter of law on Sara Lee's claim under the North Carolina Unfair Trade Practices Act, and for negligent misrepresentation and trade libel. In addition, I must dismiss Sara Lee's claim

under § 43(a) of the Lanham Act for lack of subject matter jurisdiction.

## I.  FINDINGS OF FACT

### *The Parties and Jurisdiction*

1. Counterclaim Plaintiff, Sara Lee Corporation, is incorporated in the state of Maryland and maintains its principal place of business in Chicago, Illinois. *See* Joint Final Pretrial Order ("JFPO"), Stipulated Facts, ¶ 6. Counterclaim Plaintiff, Sara Lee Hosiery, which manufactures L'eggs® pantyhose, is a wholly owned subsidiary of Counterclaim Plaintiff, Sara Lee Corporation. *See* Trial Tr. at 262–65. Counterclaim Plaintiff, Sara Lee Hosiery International, located in Winston–Salem, North Carolina, is a subdivision of Counterclaim Plaintiff, Sara Lee Hosiery. *See* JFPO, Stipulated Facts, ¶¶ 3–4.

2. Counterclaim Defendant, LCC, is incorporated in the state of New Jersey and maintains its principal place of business at 11 Harwood Lane, Clementon, New Jersey. *See id.* ¶¶ 1–2. "LCC was established for the purpose of exporting various consumer goods and personal care products to Lithuania." *Id.* ¶ 11.

3. Lithuanian-born,[9] Additional Counterclaim Defendant, Algis Vasys ("Vasys"), is "a resident [and citizen] of New Jersey who conducts his business from 11 Harwood Lane, Clementon, New Jersey." *See* JFPO, Jurisdiction, at 3. Vasys is the sole shareholder and the President of LCC. Trial Tr. at 1661, 1824; LCC Exs. 10, 11, 99.

4. Additional Counterclaim Defendant, Laima Zajanckauskiene ("Zajanckauskiene"), is a citizen of Lithuania. *See* JFPO, Jurisdiction, at 3. She is the Vice–President of LCC and it is clear from the record that she manages all of its daily operations in Eastern Europe. *See Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 23 F.Supp.2d 509, 512, 515 (noting that Zajanckauskiene is "LCC's Vice–

---

9.  *See* Trial Tr. at 1581.

President"). *See generally* Trial Tr. at 936–1031 (testimony of Zajanckauskiene). She has also repeatedly visited the United States on behalf of LCC. *See infra* ¶¶ 8, 10.

5. This Court has subject matter jurisdiction over Sara Lee's claim under § 43(a) of the Lanham Act pursuant to 28 U.S.C. § 1331.[10]

6. This Court has subject matter jurisdiction over Sara Lee's claim under the North Carolina Unfair Trade Practices Act and for negligent misrepresentation and trade libel pursuant to 28 U.S.C. § 1332,[11] as there is complete diversity of citizenship and the amount in controversy is in excess of $75,000, exclusive of interest and costs. Furthermore, this Court has subject matter jurisdiction over these claims pursuant 28 U.S.C. § 1367(a),[12] which permits this Court to exercise supplemental jurisdiction.

### The Genesis of LCC's Relationship With Sara Lee

7. Some time early in 1993, Vasys traveled to Lithuania and observed "a country emerging from 50 years of [a] totally different economic and political system." Trial Tr. at 1583. Vasys saw this period of transition as an opportunity for entrepreneurship. *See id.*

8. "In the spring of 1993," Vasys "hosted a small group of Lithuanian business people in the" United States, for "a one-week tour." *Id.* at 1584. During this tour, Zajanckauskiene and Vasys met and had the opportunity to "exchange[ ] ideas" about starting "an import business together." *Id.; see also id.* at 473 (testimony of Zajanckauskiene) (testifying that she discussed business opportunities with Vasys when she traveled to the United States in 1993).

9. Within the next few weeks, Vasys "wrote a letter of inquiry to Sara Lee, stating that [he and Zajanckauskiene] would be interested in becoming [a] pantyhose, specifically L'eggs or Hanes, and/or Hanes distributor in Lithuania." *Id.* at 1585. On May 19, 1993, Vereen Mizelle ("Mizelle") responded to this letter on behalf of Sara Lee. *See id.* Mizelle asked Vasys "nine questions, inquiring about who [they were] and what [their] plans might be if [they] in fact were appointed a distributor." *Id.;* Sara Lee Ex. 12 (letter from Mizelle to Vasys, dated May 19, 1993, asking nine questions).

10. LCC and Sara Lee then exchanged several letters, discussing the possibility of LCC selling L'eggs® pantyhose in Eastern Europe. *See, e.g.,* Sara Lee Exs. 13, 14, 19, 20, 21, 22. This exchange of correspondence culminated on December 3, 1993, when "Vasys and [ ] Zajanckauskiene traveled to Sara Lee's offices in Winston–Salem, North Carolina and met with Sara Lee employees" to discuss the possibility

---

10. Section 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

11. Section 1332 provides, in relevant part:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
> (1) citizens of different States;
> (2) citizens of a State and citizens or subjects of a foreign state;
> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

> (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.
> 28 U.S.C. § 1332(a).

12. Section 1367(a) provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

of LCC exporting Sara Lee hosiery into Lithuania. JFPO, Stipulated Facts, ¶ 13; *see also* Trial Tr. at 480 (testimony of Zajanckauskiene) (testifying that "on December 3, '93 Mr. Vasys and I, we went to Winston–Salem to meet with Sara Lee representative Vereen Mizelle"); LCC Ex. 11 (letter from Vasys to Mizelle, dated Nov. 1, 1993, confirming "arrangements for a visit to [Sara Lee's] offices on December 3, 1993"). This meeting permitted Vasys and Zajanckauskiene to "familiarize themselves with the product, to familiarize them[selves] with the way [Sara Lee] did business between [itself] and distributors, to [learn] about the nature of the product[,] how [Sara Lee] would market[, and] how [Sara Lee] would spend money with [LCC]." Trial Tr. at 1463 (testimony of Mizelle); *see also id.* at 480–81 (testimony of Zajanckauskiene) (same).

11. "Following this meeting, LCC made its initial purchase of L'eggs® brand pantyhose ordering the styles Sheer Energy®, Sheer Elengance®, L'eggs Classics®, Active Support®, and Little L'eggs Tights®." JFPO, Stipulated Facts, ¶ 14; *see also* Sara Lee Ex. 29 (Invoice No. 931208); LCC Ex. 14 (same). On December 8, 1993, Sara Lee sent an invoice to LCC for 928 dozen pairs of pantyhose for the price of $19,951.30, to be sent by truck from North Carolina to New Jersey. *See* Sara Lee Ex. 29. Sara Lee also sent, free of charge, displays, consumer pamphlets, posters, and swatches. *See id.*

12. Sara Lee granted LCC the exclusive right to sell L'eggs® pantyhose in Lithuania, Latvia, Estonia, and the Russian District of Kaliningrad. *See* LCC Ex. 110 (letter from Mizelle to Whom It May Concern, dated Aug. 23, 1995).

13. LCC had already applied to the Lithuanian Government to obtain a tariff exemption for L'eggs® pantyhose, arguing that L'eggs® pantyhose with spandex prevent varicose veins and, thus, are a medical product. *See* JFPO, Stipulated Facts, ¶ 15. To this end, LCC submitted various documents, *see* Sara Lee Ex. 30, including a "Certificate of Quality," signed by Mizelle, which asserted that Active Support® pantyhose "stimulate[ ] circulation to prevent swollen, tired, and aching legs." Sara Lee Ex. 51. In this Certificate, Mizelle also certified that other L'eggs® brands that contained spandex had qualities similar to Active Support®. *See id.* Based on this and other information, the Lithuanian Government granted the tariff exemption, permitting LCC to import L'eggs® pantyhose without paying any tariff charges. *See* JFPO, Stipulated Facts, ¶ 15. The Latvian government, after considering similar information, granted the same tariff exemption. *See* Sara Lee Ex. 177.

14. Another brand of pantyhose, Sanpellegrino, had also obtained "the varicose veins exemption" from the Lithuanian Government, Trial Tr. at 2182 (testimony of Vasys), even though some of the Sanpellegrino brands had less spandex than some of the L'eggs® brand pantyhose that had been granted the exemption. *See id.* at 2183.

15. After placing its first order for L'eggs® pantyhose in December of 1993, LCC continued to purchase L'eggs® pantyhose from Sara Lee and sell them in its territory. *See* LCC Ex. 117 (summarizing LCC purchases of L'eggs® pantyhose). LCC's sales grew rapidly. *See* Trial Tr. at 496 (testimony of Zajanckauskiene) (testifying that LCC experienced "500 percent growth" by the end of 1994). As Zajanckauskiene testified:

> [E]verybody [was] buying like crazy, all the women loved it [L'eggs pantyhose]. And the women, once they buy one time, they would always come back. And since we advertised a lot, people would be calling us and asking how come your store doesn't carry that pantyhose, and the store [managers] then would come themselves to our store and contact us, saying that [they would] like to sell [L'eggs pantyhose]. And that's how the network spread and grew.

Trial Tr. at 496. As a result of this success, LCC abandoned its attempts to sell any other products and focused its efforts exclusively on L'eggs® pantyhose. *See id.* at 1838 (testimony of Vasys).

16. In addition to purchasing pantyhose from Sara Lee and importing it into Lithuania, LCC also "engaged in a widespread advertising campaign consisting of television commercials, radio advertisements, billboards, in-store posters, coupons and distributed pamphlets." JFPO, Stipulated Facts, ¶ 16; *see also* LCC Ex. 51 (listing advertising expenses). LCC obtained some of this advertising material from Sara Lee and created some of it independently. *See* LCC Ex. 14 (December 8, 1993, invoice providing advertising material at no cost); Sara Lee Exs. 358–60 (examples of advertising produced by LCC). In addition, Sara Lee had established "a co-op program," through which Sara Lee would reimburse its distributors for a portion of their advertising expenses as an incentive to distributors to promote Sara Lee products. Trial Tr. at 1516 (testimony of Mizelle); *see also* LCC Ex. 19 (letter from Vasys to Mizelle, dated May 9, 1994, asking for "a refund of approximately $2,000" of "a total of $7,371,73 [spent by LCC] for advertising L'eggs"); LCC Ex. 49 (letter from Vasys to Mizelle, dated Nov. 23, 1994, noting a total of $10,631 in advertising expenditures and requesting that Sara Lee "[p]lease send us the check for your participation in these advertising expenses"); LCC Ex. 53 (check from Sara Lee to LCC for $2,800 for "advertising").

17. As part of its advertising, LCC "put [a] special kind of stickers on the Sara Lee product, on the boxes of pantyhose[, that] carried [the LCC] logo, ... address and the phone number." Trial Tr. at 580 (testimony of Zajanckauskiene). LCC had these stickers "made ... in [the] U.S., because in Lithuania [there is no] access to manufacturing something as good quality as the stickies made in the U.S." *Id.*

18. As part of its efforts to promote the L'eggs® brand itself, LCC advertised that "L'eggs will ... guard your legs from fatigue and varicose veins." Sara Lee Ex. 358 (quoting English translation of Lithuanian television commercial). Similarly, LCC claimed that L'eggs® pantyhose "speed[ ] up blood circulation in veins in legs, three, five times.... This is the prophylactic measure against superficial vein expansion in legs[,] veins varicose, swolleness of the legs from the hard working, standing and sitting position." *Id.* (English translation of Lithuanian store poster); *see also* Sara Lee Exs. 359, 360.

19. Sara Lee's own brochures and advertisements for L'eggs® pantyhose claimed that Active Support® pantyhose "stimulates circulation to prevent swollen, tired and achy legs." LCC Ex. 21. Sara Lee's own advertising also claimed that Sheer Energy® pantyhose "give the legs an All Day Message®." *Id.*

20. Three witnesses testified at trial that L'eggs® brand pantyhose helped to prevent varicose veins. Mizelle, then an Assistant Marketing Manager for Sara Lee, testified that he "recommend[ed] L'eggs pantyhose for speeding blood circulation ... because in [his] mind [he] associated that with varicose veins." Trial Tr. at 1419. Similarly, Zajanckauskiene testified that L'eggs pantyhose "help[ ] a lot like a prophylactic means" to "guard your legs from fatigue and varicose veins." *Id.* at 1121. Zajanckauskiene also testified that "Mizelle explained [to Vasys and Zajanckauskiene] that certain styles of pantyhose[, which] have spandex in them, ... [serve as a] prophylactic means of, to fight varicose vein problems." *Id.* at 488; *see also id.* at 600. Lithuanian Dr. Irena Pivoriuniene, who graduated from Vilnus University Medical School and currently hosts a television talk show in Lithuania, *see id.* at 721–22, testified that L'eggs® pantyhose do not help a woman whose "veins are already expanded and swollen," but that they can prevent varicose veins "for a

woman who doesn't have" them already. *Id.* at 757–58.

21. Zajanckauskiene, however, testified that Mexicanmanufactured L'eggs Regular do not improve circulation or prevent varicose veins, although LCC advertised that they do. *See id.* at 1122–23. Zajanckauskiene testified the advertisements for Mexican-made L'eggs Regular contained incorrect information, because "the person who prepared the advertisement" included his or her own "conclusions," without approval from LCC. *Id.*

22. Sara Lee claims that LCC falsely represented that L'eggs® pantyhose had "certain medical and therapeutic qualities" in its advertising and in its applications for tariff exemptions. *See* JFPO, Sara Lee's Contested Facts Regarding Liability, ¶¶ 63–97, 104. Sara Lee, however, did not present any evidence at trial which suggests that L'eggs® pantyhose do not assist in the prevention of varicose veins. Thus, Sara Lee has failed to meet its burden of proving that LCC's advertising and representations to the Lithuanian and Latvian governments were false, misleading, or disparaging.

### The "Russian Donation"

23. "Less than six months after LCC began purchasing pantyhose from Sara Lee, Sara Lee donated L'eggs® brand pantyhose products to an organization known as Brother–to–Brother International, Inc., which in turn used them for a project engaged in providing clothing, food, medicine and other relief supplies to people suffering in the Republic of Belarus and many other countries[, formerly a part] of the former Soviet Union." JFPO, Stipulated Facts, ¶ 18.

24. The Court takes judicial notice that the Republic of Belarus borders Lithuania and Latvia. *See* Fed.R.Evid. 201.

25. Some of the pantyhose donated to Brother–to–Brother (the "Russian Donation") reached the Lithuanian market, creating a black-market for pantyhose and artificially suppressing the demand for pantyhose in Lithuania. *See* Trial Tr. at 497–99, 579, 1245 (testimony of Zajanckauskiene) (testifying about the marked decline of LCC's growth in sales following the Russian donation); LCC Ex. 40 (memorandum from Mizelle to Herve Roche, dated Oct. 19, 1994, noting "that someone has come into the country offering L'eggs to retailers at $1.00 per unit" and that these "goods were obtained (stolen?) from Russia"); LCC Ex. 54 (letter from Vasys to John Piazza, Vice–President of Sara Lee, dated Dec. 19, 1994, claiming that LCC "now ha[s] proof that large quantities of black-market L'eggs are being sold openly to retailers in LCC's exclusive distribution area").

26. On October 24, 1994, Vasys wrote a letter to Mizelle, complaining of the detrimental effects of the donation on LCC's efforts to .establish a market for L'eggs® pantyhose in Lithuania. *See* LCC Ex. 43. Vasys requested that Sara Lee take some action to repair the damage that the Russian Donation caused to LCC's pantyhose market in its territory. *See id.*

### The Mexican–Manufactured Pantyhose

27. "On July 7, 1995, the parties signed a letter agreement to resolve LCC's claims." JFPO, Stipulated Facts, ¶ 19; *see also* Sara Lee Ex. 133 (July 7, 1995, Letter Agreement); LCC Ex. 99 (same). The Letter Agreement, signed by Vasys on behalf of LCC and Mizelle on behalf of Sara Lee, released "Sara Lee Hosiery and any affiliated company, successor, assignee, officer, director, employee, or agent from any claim, demand, or cause of action LCC [might have had or] may have ... in the future growing out of any matter or dispute whatsoever related to any act or event occurring up to or through the date of this letter." LCC Ex. 99; Sara Lee Ex. 133. In exchange for this release, Sara Lee agreed to provide LCC with 34,835 dozens of L'eggs® pantyhose manufactured by Manufacturas Mallorca de Mexico, at no charge other than shipping expenses. *See* Sara Lee Ex. 133; LCC Ex. 99; *see also* JFPO, Stipulated Facts, ¶ 19

("Pursuant to this agreement, LCC was obligated to pay transportation costs associated with shipping the Mexican manufactured pantyhose to Lithuania.").

28. "Less than two years after Manufacturas Mallorca de Mexico first started manufacturing L'eggs brand pantyhose in 1993, Sara Lee ceased manufacturing L'eggs at its Mexican facility and withdrew all L'eggs pantyhose from the Mexican market." JFPO, Stipulated Facts, ¶ 30. Sara Lee removed the Mexicanmanufactured pantyhose from the Mexican market as a result of customer complaints. *See* LCC Ex. 87; Trial Tr. at 2482 (testimony of Herve Roche).

29. After LCC received and attempted to sell the Mexican pantyhose in Lithuania, it too received numerous customer complaints. *See* Trial Tr. at 621 (testimony of Zajanckauskiene) (testifying that "LCC had a lot of complaints coming in from stores, from the stores that bought product from us[, saying that] [c]ustomers [had] started bringing in the product into the stores that they bought it from"); LCC Ex. 122 (letter from Vasys to Peter Hellebush, Vice–President of Sara Lee, reporting various defects in the Mexicanmanufactured pantyhose and noting that LCC was "being deluged by consumer and retailer complaints and returned product"). For example, Algimantas Akstinas, owner of Akste, a Lithuanian shoe and auto parts store, complained to Zajanckauskiene that:

> On September 28, 1995 we bought from your firm 30 pairs of L'EGGS women's pantyhose made in Mexico. In three months we sold 25 pairs, 20 of which were returned to us by our customers because of poor quality. We request you to take the above mentioned poor quality merchandise back, or exchange it with good quality items.

LCC Ex. 261.

30. By late 1995, LCC removed the Mexican-made pantyhose from the market in Lithuania. *See* Trial Tr. at 656 (testimony of Zajanckauskiene); LCC Exs. 120 (memorandum from Vasys to Mizelle, dated December 6, 1995, noting "the product from Mexico is of such poor quality that [LCC] had to pull it from all shelves"); *see also* Trial Tr. at 1221 (testimony of Zajanckauskiene) (testifying that LCC removed the Mexicanmanufactured pantyhose in December, 1996). Zajanckauskiene testified that representatives from LCC "had personally to go and visit all of [its] clients, stores, explain to them what happened and that [LCC] really didn't know ... that the product [was] of such poor quality, but only that it [was] news to [LCC] as well, apologize and also take the product back." Trial Tr. at 656.

31. After it removed the Mexican-manufactured pantyhose from the Lithuanian market, LCC sold the remainder of its stock of American-made pantyhose, with sales dwindling in 1996, and its "last sale ... in September of 1997." *Id.* at 1204, 1208, 1247 (testimony of Zajanckauskiene); LCC Ex. 98 (chart of monthly sales for 1995 and 1996). Vasys testified that "by September [1996, LCC had] been virtually out of business for all practical purposes for months and months and months." Trial Tr. at 1801; *see also id.* at 2141 (testimony of Vasys that, by September, 1996, "for nine months [LCC] had no product so [it] lost [its] position in the marketplace").

32. LCC no longer uses its former office located in Clementon, New Jersey. *See* Trial Tr. at 1916 (testimony of Vasys).

33. Similarly, LCC's "[r]eal advertising campaigns ended in 1995." Trial Tr. at 1796 (testimony of Vasys).

34. On April 29, 1996, LCC filed a complaint against Sara Lee, containing allegations arising out of the events surrounding the July 7, 1995, Letter Agreement. *See* Complaint, filed Apr. 29, 1996. After LCC presented evidence for six weeks, this Court granted Sara Lee's motion for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure, finding that LCC had failed to present evidence on at least one essential element of each of its remaining claims. *See Li-*

*thuanian Commerce Corp. v. Sara Lee Hosiery,* 23 F.Supp.2d 509 (D.N.J.1998).

35. Sara Lee filed its Counterclaim on April 14, 1997, alleging that LCC, including Additional Counterclaim Defendants, Algis Vasys and Laima Zajanckauskiene, had provided false and misleading information in its advertising campaign and in its representations to the Lithuanian Government to obtain a tariff exemption. *See* Counterclaim, filed Apr. 14, 1997; Third–Party Compl., filed Apr. 14, 1997.

**Sara Lee's Alleged Injuries**

36. In the JFPO, Sara Lee alleges that it suffered numerous injuries as a result of LCC's allegedly false advertising, namely:

   a. loss of goodwill in the Baltics, *see* JFPO, Sara Lee's Contested Facts in Regard to Damages, ¶¶ 1, 6, 8, 11, 16, 19 (pages 84–87); *see also* Sara Lee's Proposed Findings of Fact and Conclusions of Law ("Sara Lee's Proposed Findings", dated Nov. 20, 1998, § 25(2)) (claiming that "Sara Lee has suffered damage to its reputation and loss of goodwill in the Baltics");

   b. exposure "to numerous individual consumer suits on the basis that Sara Lee's L'eggs® brand pantyhose products failed to provide the medical and therapeutic qualities that LCC falsely represented in its print, radio and television" advertisements, JFPO, Sara Lee's Contested Facts in Regard to Damages, ¶¶ 2, 5, 8, 14, 16, 19 (pages 84–87); *see also* Sara Lee's Proposed Findings ¶ 25(1) (claiming that "Sara Lee has been exposed to possible civil lawsuits by individual consumers"); and

   c. possible involvement "in a civil or criminal investigation of LCC by the Lithuanian and Latvian governments, at great expense and burden to Sara Lee," JFPO, Sara Lee's Contested Facts in Regard to Damages, ¶¶ 3, 14, 16 (pages 84–87); *see also* Sara Lee's Proposed Findings ¶ 25(1) (claiming that "Sara Lee has been exposed to ... the expense and burden of a possible civil or criminal investigation of LCC and Sara Lee by the Lithuanian and Latvian governments, in addition to possible liability from the Lithuanian government for the V.A.T. which unquestionably should have been paid by LCC").[13]

37. At trial, Sara Lee presented absolutely no evidence that it has suffered any loss of goodwill, either in the United States or abroad. Consequently, Sara Lee, as Counterclaim Plaintiff, has failed to meet its burden of proving that it has lost goodwill.

38. Similarly, Sara Lee presented no evidence at trial to suggest that any consumers have been dissatisfied with the alleged therapeutic qualities of L'eggs® pantyhose or that they have any intention to sue for a breach of warranty. In fact, the evidence presented at trial suggests that all consumer complaints made to the Lithuanian Department of Quality Inspection about L'eggs pantyhose had been "about the quality of the Mexican L'eggs pantyhose." Trial Tr. at 1200 (testimony of Zajanckauskiene); *see also id.* 1372 (testimony of Zajanckauskiene, reading from LCC Ex. 270) (testifying that "[during the year of '94, '95], and '96 consumers did not apply to the Lithuanian State Quality Inspection under the State Service of Competition and Consumer Rights Protection regarding the quality of women L'eggs pantyhose"). Thus, there is no evidence in

---

13. In the JFPO, Sara Lee also alleged that it suffered "actual damages in the form of payments made to LCC for false advertising ... [since LCC] submitt[ed] bills to Sara Lee for advertising reimbursement in the amount of $6,995,00," JFPO, Sara Lee's Contested Facts Regarding Damages, ¶¶ 6, 12, 13 (pages 84–87). As·reflected in its Proposed Findings of Fact and Conclusions of Law, Sara Lee abandoned this claim when it withdrew its claims for damages. *See* Sara Lee's Proposed Findings ¶ 25.

the trial record that Sara Lee faces any potential exposure to breach of warranty suits from consumers as a result of LCC's alleged false advertising about the therapeutic qualities of L'eggs® pantyhose.

39. In response to the Counterclaims, "filed . . . against [Zajanckauskiene] personally and LCC and Mr. Vasys, regarding the allegedly false advertising," Zajanckauskiene "met with Gintaras Pukas, [a lawyer in Lithuania], asking him to conduct [an] investigation and to clarify—find out whether [LCC] broke any laws, currently existing laws in Lithuania regarding advertising . . . [a]nd also the customs tariffs laws." Trial Tr. at 1323 (testimony of Zajanckauskiene).

40. Specifically, Zajanckauskiene "directed Mr. Pukas to contact the Ministry of Protection of Health of Lithuania, also the Finance Ministry of the Republic of Lithuania, the Agencies of Competition and Consumer Rights Protection." *Id.* at 1323–24; *see also* LCC Exs. 375A (letter from Attorney Gintaras Pukas to the Ministry of Health Protection, dated Apr. 22, 1997), 375B (letter from Attorney Gintaras Pukas to Lithuanian Agency of State Quality Inspection, dated Apr. 22, 1997); 379 (letter from Attorney Gintaras Pukas to Ministry of Finance, dated Apr. 24, 1997). Zajanckauskiene "submitted [LCC's] advertising material to Mr. Pukas and directed him to find out if [LCC] didn't break the laws of the Republic of Lithuania that . . . existed in '94, '95 and '96." Trial Tr. at 1324. Zajanckauskiene "also asked him to find out on what basis the decision of the Health Protection Ministry was grounded, the decision of '95," which granted a tariff exemption for Sara Lee pantyhose. *Id.* In particular, Zajanckauskiene "directed Mr. Pukas to forward to the ministry the texts of the TV commercial, 20–second TV commercial, also another TV commercial for 60 seconds, radio advertisement, an audio clip, also L'eggs brochures in Lithuanian language, and our advertising posters." *Id.* at 1325.

41. In response to Mr. Pukas's inquiries, the Ministry of Health Protection sent a letter, stating that the advertising materials that Mr. Pukas had sent did "not violate any Republic of Lithuania laws, or regulations, nor any RLMHP adopted decisions (directives) in effect in 1994, 1995, and 1996." LCC Ex. 176 (letter from Vytautas Kriauza, of the Ministry of Health Protection, to Attorney Gintaras Pukas, dated Apr. 28, 1997). The letter from the Ministry of Health Protection also stated that its determination that those pantyhose described in the "Certificate of Quality," issued by Mizelle, assisted in the prevention of varicose veins, was based solely on the Certificate itself. *Id.*

42. R. Stanikunas, of the Lithuanian State Competition and Consumer Rights Protection Agency, also responded to an inquiry from Mr. Pukas. *See* LCC Ex. 377. The Agency reviewed the "LCC advertising material used in 1994, 1995 and 1996 to promote L'eggs pantyhose" and concluded that the "advertising materials, their text (contents) and method of their use d[id] not violate any laws or established acts (regulations) of the Republic of Lithuania which were in effect in 1994, 1995 and 1996, or any adopted regulations of any government institution (agency)." *Id.*

43. In response to Mr. Pukas's inquiry, V. Latviene, of the Ministry of Finance, wrote that LCC's reliance upon a tariff exemption to import L'eggs® pantyhose without paying any tariff to the Lithuanian government "did not violate any customs procedures of the Republic of Lithuania or any other requirement adopted by the regulatory rules of the customs procedures." LCC Ex. 378.

44. Sara Lee did not present any evidence at trial suggesting that any arm of the Lithuanian Government has threatened to, or will likely impose sanctions, file charges, or take any other sort of legal action in response to LCC's importing and/or advertising of L'eggs® pantyhose in 1994–1996. Further, the letters from

the Ministry of Health, the Lithuanian State Competition and Consumer Rights Protection Agency, and the Ministry of Finance strongly suggest that no such legal consequences will ensue as a result of LCC's activities in importing, advertising, and selling L'eggs® brand pantyhose. Carl Hittinger, Esq., counsel for Sara Lee, even admitted that there is nothing in the trial record reflecting governmental complaints or investigations. *See* Trial Tr. at 2651. Thus, Sara Lee, as Counterclaim Plaintiff, has clearly failed to meet its burden of proving that it faces actual, likely, or even possible exposure to civil or criminal liability arising from LCC's conduct, or its own.

45. In sum, Sara Lee has failed to present any evidence at trial that it has suffered any of the injuries for which it seeks relief.

## II. CONCLUSIONS OF LAW

### Lanham Act

1. Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), provides, in relevant part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

2. To prevail on a claim of unfair competition under § 43(a) of the Lanham Act, a plaintiff has the burden of proving by a preponderance of the evidence:

1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*U.S. Healthcare v. Blue Cross*, 898 F.2d 914, 922–23 (3d Cir.1990) (alteration in original) (quoting *Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D.Pa.1982)).

3. "[T]he Supreme Court in *Steele v. Bulova Watch Co.*, 344 U.S. 280, 286–87, 73 S.Ct. 252, 97 L.Ed. 319 (1952), long ago recognized the power of federal courts in appropriate circumstances to issue injunctions prohibiting extraterritorial conduct that in violating the Lanham Act would cause harm to United States commerce." *Nintendo of America, Inc. v. Aeropower Co.*, 34 F.3d 246, 250 (4th Cir.1994).

4. "First, it seems clear that, just as in the interstate context, the extraterritorial coverage of the Lanham Act should be gauged not so much by the locus of the activity sought to be reached[, but] by the nature of its effect on that commerce which Congress may regulate." *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 428 (9th Cir.1977) (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280, 286, 73 S.Ct. 252, 97 L.Ed. 319 (1952)).

5. "[T]he jurisdictional requirement that infringement occur 'in com-

merce' has been read not necessarily to require that the infringing acts have taken place 'in commerce' which is subject to congressional regulation, but the acts have an adverse effect on that commerce." *Id.* at 427; *see also Nintendo,* 34 F.3d at 250 (holding that the jurisdiction of the Lanham Act extends to cases where "the defendant's extraterritorial conduct was not confined in its effects to the foreign nation where it occurred, but could have adverse effects on commerce within the United States").

■ 6. While some courts have held that, under § 43(a) of the Lanham Act, a plaintiff must prove a "substantial effect on United States commerce," *see, e.g., Atlantic Richfield Co. v. Arco Globus Int'l Co.,* 150 F.3d 189, 192 (2d Cir.1998), other courts have disagreed with this holding and concluded that a plaintiff need only demonstrate "an adverse effect on ... commerce" in the United States. *See, e.g., American Rice, Inc. v. Arkansas Rice Growers Cooperative Ass'n,* 701 F.2d 408, 413–15 (5th Cir.1983); *Wells Fargo,* 556 F.2d at 427. To resolve Sara Lee's Lanham Act claim, however, I need not address, or attempt to resolve, this split of authority, because at the very least a plaintiff must prove *some* adverse impact on commerce in the United States. *See Bulova,* 344 U.S. at 288, 73 S.Ct. 252 (finding jurisdiction under the Lanham Act where the defendant " 'brought about forbidden results within the United States' ") (quoting *United States v. Sisal Sales Corp.,* 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042 (1927)); *see also Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 316, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970) (Harlan, J., dissenting) (noting that in *Bulova* "[t]here was no question that plaintiff had suffered the injury and American commerce had been adversely affected in the way that the Lanham Act sought to prevent"). Sara Lee has failed to present sufficient evidence to meet its burden of proof under either standard.

7. A plaintiff's failure to demonstrate that the alleged unfair trade practices had "adverse effects on commerce within the United States" deprives the Court of jurisdiction under the Lanham Act. *See Bulova Watch Co.,* 344 U.S. at 281, 73 S.Ct. 252; *Nintendo,* 34 F.3d at 250.

8. This Court found above, in its findings of fact, that Sara Lee presented no evidence at trial demonstrating that LCC's alleged misrepresentations and false advertising had an adverse effect on commerce within the United States. Sara Lee has not presented any evidence that it sustained a loss of profits, goodwill, or otherwise felt the impact of LCC's alleged misrepresentations and false advertising. Without any evidence of the effect of LCC's alleged conduct, this Court certainly cannot conclude that the effect was "adverse." Thus, Sara Lee has failed to meet its burden of proving an essential, jurisdictional element of its claim under § 43(a) of the Lanham Act. Accordingly, this Court does not have jurisdiction over Sara Lee's Lanham Act claim, and must dismiss the Lanham Act claim for lack of subject matter jurisdiction. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998) (holding that " '[without jurisdiction] the court cannot proceed at all in any cause' ") (quoting *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)).

### North Carolina Unfair Trade Practices Act

9. The North Carolina Unfair Trade Practices Act provides, in relevant part: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen.Stat. § 75–1.1.

■ 10. "To establish a prima facie claim for unfair trade practices, the plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting

commerce, N.C. Gen. State. § 75–1.1 (1994), and (3) the act proximately caused injury to the plaintiff." *Pleasant Valley Promenade v. Lechmere, Inc.,* 120 N.C.App. 650, 464 S.E. 47, 58 (1995) (applying § 75–1.1).

■ 11. "The overall purpose and legislative intent of G.S. 75–1.1 is 'to declare deceptive acts or practices in the conduct of any trade or commerce in North Carolina unlawful, to provide civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public within this State, and to enable a person injured by deceptive acts or practices to recover treble damages from a wrongdoer.'" *McDonald v. Scarboro,* 91 N.C.App. 13, 370 S.E.2d 680, 683 (1988) (quoting *Hardy v. Toler,* 24 N.C.App. 625, 211 S.E.2d 809, 813, *modified on other grounds,* 288 N.C. 303, 218 S.E.2d 342 (1975)).

12. Section "75–1.1[ ] requires an in-state injury to plaintiff before plaintiff can state a valid unfair trade claim." *The 'In' Porters, S.A. v. Hanes Printables, Inc.,* 663 F.Supp. 494, 501 (M.D.N.C.1987).

■ 13. As this Court noted in its findings of fact above, Sara Lee has presented no evidence suggesting that it suffered any injury, let along "an in-state injury." *See id.* Accordingly, Sara Lee has failed to meet its burden of proving its claim under the North Carolina Unfair Trade Practices Act.

### Negligent Misrepresentation

■ 14. This Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332, over Sara Lee's claim for negligent misrepresentation. In resolving a claim brought under the Court's diversity jurisdiction, "the law to be applied ... is the law of the state." *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 417, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (holding that, under the *Erie* doctrine, "federal courts sitting in diversity apply state substantive law and federal procedural law"). Accordingly, this Court must apply New Jersey law in its consideration of Sara Lee's claim for negligent misrepresentation. *Cf. Lithuanian Commerce Corp. v. Sara Lee Hosiery,* 23 F.Supp.2d 509, 515 (D.N.J. 1998) (applying New Jersey law to LCC's common law claims). Moreover, the parties have proceeded on the assumption that New Jersey law governs the state law claims in this case, other than the claim specifically asserted by Sara Lee under North Carolina statutory law. *See* Memorandum of Law in Support of Plaintiff's/Third Party Defendant's Motion for Judgment as a Matter of Law, filed Nov. 20, 1998, at 13–16 (applying New Jersey law to Sara Lee's claims for negligent misrepresentation and trade libel); Sara Lee's Memorandum of Law in Opposition to LCC's Motion for Judgment as a Matter of Law, filed Dec. 18, 1998, at 26, 32 (same).

■ 15. "[N]egligent misrepresentation ... requires proof that an 'incorrect statement was negligently made and justifiably relied upon' and that injury was sustained as a consequence of that reliance." *Carroll v. Cellco Partnership,* 313 N.J.Super. 488, 502, 713 A.2d 509 (N.J.Super.Ct.App.Div.1998) (quoting *Gross v. Johnson & Johnson–Merck Consumer Pharm. Co.,* 303 N.J.Super. 336, 344, 696 A.2d 793 (Law Div.1997)).

■ 16. As this Court determined in its findings of fact, Sara Lee has not met its burden of proving that LCC's representations that L'eggs pantyhose prevent varicose veins were "incorrect." *See id.*

17. Similarly, this Court also determined in its findings of fact that Sara Lee has not met its burden of proving that "injury was sustained." *See id.*

18. Furthermore, Sara Lee has not met its burden of proving that it suffered an injury "as a consequence of" LCC's alleged false or misleading statements. *See id.*

19. Because Sara Lee has failed to meet its burden of proving that LCC negligently misrepresented the qualities of L'eggs® pantyhose, Sara Lee cannot prevail on this claim.

### Trade Libel

20. This Court also has diversity jurisdiction, pursuant to 28 U.S.C. § 1332, over Sara Lee's claim for trade libel and, therefore, this Court must apply New Jersey law with respect to this claim. *See supra* ¶ 14.

21. To prove a claim of trade libel under New Jersey law, a plaintiff "must demonstrate 1) publication 2) with malice 3) of false allegations concerning its property, product or business, and 4) special damages, i.e., pecuniary harm." *Juliano v. ITT Corp.*, Civ. No. 90–1575, 1991 WL 10023, *4 (D.N.J. Jan.22, 1991) (Fisher, J.) (citing *System Operations v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir.1977)).

22. In its findings of fact, this Court found that Sara Lee presented no evidence at trial tending to show that LCC's representations that L'eggs® pantyhose prevent varicose veins were false. Indeed, three witnesses, Mizelle, Zajanckauskiene, and Dr. Pirouviene, testified that L'eggs® pantyhose do prevent varicose veins. Thus, Sara Lee has failed to meet its burden of proving that LCC made "false allegations concerning" L'eggs® pantyhose, which is an essential element of a trade libel claim. *See id.*

23. In addition, Sara Lee has presented no evidence of "pecuniary harm," which is an element of a claim for trade libel under New Jersey law. *See id.* Indeed, Sara Lee withdrew its claims for monetary damages and, as a result, did not pursue a claim for pecuniary loss. Thus, Sara Lee has failed to meet its burden of proof on a second essential element of trade libel under New Jersey law.

24. Because Sara Lee has failed to meet its burden of proof with respect to at least two of the essential elements of a trade libel claim, Sara Lee cannot prevail on this claim.

### Relief Requested

25. Sara Lee seeks injunctive relief under all four counterclaims, as well as attorneys' fees under the North Carolina Unfair Trade Practices Act.

26. Specifically, Sara Lee requests that this Court issue a permanent injunction that would require LCC "to notify their customers that the ads that [LCC] placed before were not true[ and] were misleading." Trial Tr. at 2615 (statement of Carl Hittinger, Esq., counsel for Sara Lee).

27. Sara Lee has abandoned any claim for monetary damages. *See* Trial Tr. ar 2624–25.

28. "In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e., met its burden of proof)." *Ciba–Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 850 (3d Cir.1984). Because I have found above that Sara Lee has failed to meet its burden of proof on each of its counterclaims, I find that a permanent injunction should not be issued.

29. Moreover, since I have concluded above that Sara Lee has failed to meet its burden of proof under the North Carolina Unfair Trade Practices Act, I hold that Sara Lee is not entitled to recover attorneys' fees under that Act.

### III. MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 52(c)

LCC has moved this "Court to enter a Judgment as a Matter of Law in favor of LCC with regard to all remaining counts of the Counterclaim" of Sara Lee. Plaintiff's and Counterclaim Defendants' Motion for Judgment as a Matter of Law, filed Nov. 20, 1998, at 2.

In making its findings of fact and conclusions of law, this Court has determined

that Sara Lee has failed to meet its burden of proof on at least one of the essential elements of each of its counterclaims. Accordingly, I will grant LCC's motion for judgment as a matter of law on Sara Lee's claim under the North Carolina Unfair Trade Practices Act and for negligent misrepresentation and trade libel. In addition, I must dismiss Sara Lee's claim under § 43(a) of the Lanham Act for lack of subject matter jurisdiction.

## IV. CONCLUSION

Based upon the findings of fact and conclusions of law set forth above, this Court has determined that Sara Lee has failed to meet its burden of proof on at least one essential element of each of its counterclaims and claims made in its Third–Party Complaint. Accordingly, I will grant LCC's motion for judgment as a matter of law, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, on Sara Lee's Counterclaim and its Third–Party Complaint. I will enter an appropriate order.

### ORDER

This matter having come before the Court on the motion of Plaintiff and Counterclaim Defendant, Lithuanian Commerce Corpation, and Additional Counterclaim Defendants, Algis Vasys and Laima Zajanckauskiene (collectively, "LCC"), for judgment as a matter of law, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, on the Counterclaims and Third Party Complaint of Defendants and Counterclaim Plaintiffs, Sara Lee Hosiery, Sara Lee Hosiery International, Sara Lee International, and Sara Lee Corporation (collectively, "Sara Lee"), Gregory D. Saputelli, Esq., and James R. Thompson, Esq., of Obermayer, Rebmann, Maxwell & Hippel, LLP, appearing on behalf of LCC, and Carl W. Hittinger, Esq., and Neil C. Schur, Esq., of Stevens & Lee, PC, appearing on behalf of Sara Lee; and,

The Court having considered the submissions of the parties, as well as the evidence presented at trial; and,

The Court having made its findings of fact and conclusions of law as set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 23rd day of April, 1999, HEREBY ORDERED that the motion of LCC for a judgment as a matter of law on the Counterclaims and Third–Party Complaint of Sara Lee is GRANTED.